. **In re CROSS MEDIA MARKETING CORPORATION SECURITIES LITIGATION.**

**No. 02 CIV. 5462(RPP).**

United States District Court,
S.D. New York.

April 20, 2004.

Bernstein Liebhard & Lifshitz, LLP, New York City, by Joseph R. Seidman, Jr., Goodkind Labaton Rudoff & Sucharow LLP, New York City, by Laurence Paskowitz, Roy L. Jacobs, New York City, for Plaintiffs.

Katten Muchin Zavis Rosenman, New York City, by Joel W. Sternman, for Individual Defendants.

Kramer Levin Naftalis & Frankel LLP, New York City, by Ellen R. Nadler, for Defendant Cross Media Marketing Corporation.

## OPINION AND ORDER

PATTERSON, District Judge.

Defendants[1] Ronald S. Altbach ("Alt-

---

1. Defendant Cross Media Marketing Corpora-    tion ("Cross Media"), a named defendant, has

bach"), Alfonso J. Cervantes ("Cervantes"), Chet Borgida ("Borgida"), Dennis Gougion ("Gougion") and Richard L. Prochnow ("Prochnow") move, pursuant to Rules 12(b)(6) and (9)(b) of the Federal Rules of Civil Procedure, to dismiss the claims in a purported class action brought by lead plaintiffs, William Woodruff, Steven Haines and W.D. Wadlington,[2] charging violations of Sections 10(b), Securities and Exchange Commission Rule 10(b)(5) promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934. (Pls.' Consol. Am. Class Action Compl. Violation Secs. Laws. [hereinafter Am. Compl.] ¶¶ 115, 117.) Plaintiff's Consolidated Amended Class–Action Complaint for Violation of the Securities Laws (the "Amended Complaint") is based upon investigation by counsel, including: public filings with the Securities and Exchange Commission ("SEC"); press releases and other publications by defendants; and documents pertaining to a Federal Trade Commission complaint[3] (the "FTC Complaint") filed against Cross Media and others on April 10, 2002.

## I. The Allegations of the Amended Complaint

### A. The Parties

Plaintiffs' action is brought on behalf of all persons who, from November 5, 2001 through July 11, 2002 (the "class period"), purchased common stock of Cross Media at a price allegedly artificially inflated by Defendants (Am.Compl.¶ 1).

Defendant Cross Media is a direct marketer of various items, including magazine subscriptions, to approximately 30 million

customers. (*Id.* ¶ 3.) In 2001, 81% of Cross Media's revenues resulted from direct marketing of magazine subscriptions. (*Id.*) Defendant Cross Media, formerly named Symposium, Inc. ("Symposium"), began trading in the public securities markets as Symposium about June 24, 1999. (*Id.* ¶ 51.) Defendant Altbach was Symposium's CEO and Chairman of the Board. (*Id.* ¶¶ 50.) On January 28, 2000, Direct Sales International, Inc. ("DSI"), a subsidiary of Symposium, purchased substantially all the assets of Direct Sales International L.P. ("DSI L.P."), a company owned by Defendant Prochnow. (*Id.* ¶¶ 48–50.) DSI then changed its name to Media Outsourcing Inc. ("MOS"). (*Id.* ¶ 48.) On December 28, 2000, Symposium changed its name to Cross Media and MOS changed its name to Consolidated Media Services. (*Id.* ¶ 51.)

Defendant Altbach, at all material times, has been a Director, Chairman of the Board, and Chief Executive Officer of Cross Media, as well as Chairman of the Board, Chief Executive Officer and President of MOS. (Am.Compl.¶ 4.)

Defendant Cervantes was, at all material times, Senior Vice President—Business Development of Cross Media and in charge of investor relations. (*Id.* ¶ 5.)

Defendant Borgida, at all material times, was Senior vice president and Chief Financial Officer of Cross Media. (*Id.* ¶ 6.)

Defendant Gougion, at all material times, has been Senior Vice President— Publishing at Cross Media, and a vice

---

filed for bankruptcy. Accordingly, all proceedings against Cross Media have been automatically stayed.

**2.** Additional plaintiffs are: Barbara Hosmer, James R. Kinsel, Ira Atlas, Ming–Liang Chang and Richard Pardo.

**3.** By letter dated August 1, 2003, plaintiffs supplied a copy of the FTC Complaint to the Court.

president and Chief Operating Officer of MOS. (*Id.* ¶ 7.)

Defendant Prochnow, at all material times, has been a "putative 'consultant'" to Cross Media under a consulting agreement to advise senior officers of MOS. (*Id.* ¶ 8.) Prochnow holds a significant amount of Cross Media stock as a result of his sale of substantially all the assets of DSI L.P. to DSI, a newly formed subsidiary of Symposium, the predecessor company to Cross Media. (*Id.* ¶ 8.) During the class period, Prochnow received substantial compensation from Cross Media. He owns a substantial amount of stock in Cross Media, a note receivable from Cross Media, and options valued at millions of dollars. (*Id.*)

Defendant Prochnow has been an employee of Cowles Communications; Budget Marketing Corporation, Inc. ("Budget"); Telephone Response in Marketing Management ("TRAM"); Magazine Sweepstakes ("MS"); and DSI L.P., and he has engaged in "Paid During Service" magazine sales ("PDS") through telemarketers since 1970. (*Id.* at ¶¶ 40–42.) The companies Prochnow has been associated with had been investigated by the Federal Trade Commission and enjoined from engaging in improper telemarketing practices by the FTC in 1972, 1980, 1988 and December 13, 1996. (*Id.* ¶¶ 37–47.)

## B. The Fraud Claims

The Amended Complaint charges each of the individual defendants with, knowingly, or in a reckless manner, being participants in a fraudulent scheme during the class action period which "(a) deceived the investing public regarding the business, finances and value of Cross Media's assets and securities; and (b) caused Plaintiffs and other members of the Class to purchase Cross Media securities at artificially inflated prices." (Am.Compl.¶¶ 10, 11.)

The Amended Complaint is based largely on the allegations contained in an FTC complaint filed on April 11, 2002 against Defendants Altbach, Gougion, Prochnow, Cross Media and MOS. The FTC Complaint charges Prochnow, Gougion and MOS (doing business under its own name or predecessor names) with continuing violations since April 1997, of a December 13, 1996 Cease and Desist Order issued by the FTC. (Compl. for Civil Penalties and Injunctive Relief, 02cv917, N.D.Ga., Submitted by Pls. via letter of 8/1/03 [hereinafter FTC Compl.] ¶¶ 38–52.) The FTC Complaint further charges that since 1997, Defendants Prochnow, Gougion and MOS, and since on or about January 28, 2000, Defendants Altbach and Cross Media violated the FTC Telemarketing Sales Rule (16 C.F.R. Part 310) and Section 5(a) of the FTC Act (15 U.S.C. § 45(a)). (Am. Compl. ¶ 20; FTC Compl. ¶¶ 48–64.) A temporary restraining order ("TRO") was applied for and denied. (Defs'. Mem. L. Supp. Their Mot. Dismiss Consol. Am. Class–Action Compl. at 4 n. 2.) The action is still pending. (*Id.*)

The Amended Complaint alleges that Cross Media and its subsidiary MOS are merely the latest in a series of telemarketing corporations, which began with Cowles Communications ("Cowles"). Since 1970, these corporations have engaged in "Paid During Service" ("PDS") magazine sales by the use of highly misleading, deceptive and illegal telemarketing sales practices which, prior to Cross Media's entry into the field, had resulted in the FTC issuing cease and desist orders (Am.Compl.¶¶ 37–48). The Amended Complaint further alleges that Defendants touted Cross Media's performance and earnings' expectations although the business had generated substantial revenue and profit through the use of the same illegal practices which previously had been found to be violations of the law. (*Id.* ¶¶ 52–53, 57, 58.) As a result, "optimistic statements … concerning the nature of the business of Cross Media and its expected earnings" made by

Defendants during the class period are alleged to be materially false and misleading and to have artificially inflated the price of Cross Media's stock, as "Defendants omitted from their positive statements any mention that positive results could only result from conduct previously determined to be unlawful by federal authorities...." (*Id.* ¶ 14.) Later in the Amended Complaint, Plaintiffs specify their allegations:

> All of these statements ... were false and misleading, as they omitted disclosure of the sales practices utilized to generate these results; the illegality of those practices; that similar practices had already led to legal action against Prochnow, Gougion and Cross Media's predecessors, ... that there was a substantial likelihood that the FTC ... would pursue action against Defendants for continuing to engage in those same practices ...; or that FTC-enforced cessation of those illegal practices would have a material adverse impact on the Company, its financial results, and its stock price.

(Am.Compl. ¶ 61.)

Further, the Amended Complaint alleges that, even after the FTC Complaint was filed against Altbach, Gougion, Prochnow, and Cross Media on April 10, 2002, the Defendants made numerous statements to the financial media downplaying the FTC action and, until July 10, 2002, misrepresented that Cross Media was on target to meet its increased earning projections. (*Id.* ¶ 22.)

The Amended Complaint focuses on the following communications: press releases released between November 5, 2001 and May 29, 2002 (*id.* ¶¶ 62, 66, 68, 74, 81, 87); Cross Media's announcement of the acquisition of National Syndications, Inc. on

January 10, 2002 (*id.* ¶ 63); Cross Media's announcement of the launch of Destinations Direct on January 28, 2002 (*id.* at ¶ 67); an excerpt from the Company's annual report dated March 27, 2002 (*id.* at ¶¶ 69, 70); two transcripts of conference calls by Altbach with investors dated April 10, 2002 (the day after the FTC filed its complaint) (*id.* ¶¶ 75–80) and May 9, 2002 (*id.* ¶¶ 82–83); forms 8–K (*id.* at ¶ 86) and 10–Q (*id.* at ¶¶ 84–85) filed with the SEC; and a June 17, 2002 interview of Altbach with the OTC Journal (*id.* ¶¶ 88–90).

On July 12, 2002, Cross Media made the following announcements: it would have a loss for the second quarter, lower than expected revenues, and the material impact of the FTC Complaint had caused a 20% loss of magazine orders. (*Id.* ¶ 92.) Cross Media's stock closed at $2.71 a share on July 12, 2002. (*Id.* ¶ 94.) [4] On July 10, 2002, before the announced loss, the stock closed at $6.69 a share. (*Id.* ¶ 22.)

## II. Discussion

Plaintiffs undertake to plead two causes of action. In the first cause of action, they assert that all Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5), by engaging in a common plan, scheme and course of conduct pursuant to which the Defendants knowingly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs and other members of the class by artificially inflating the price of Cross Media stock (*id.* ¶¶ 108–115). There are two claims within this cause of action: (1) the Defendants committed fraud by failing to disclose that Cross Media's financial earnings were the results of behavior that the FTC had pre-

---

**4.** Cross Media's stock value had reached a high of $14.89 a share during the class period. (Am.Compl. ¶ 22.)

viously found non-compliant; and (2) the public statements of Defendants regarding Cross Media's expected earnings were fraudulent.

The second cause of action is that the individual Defendants, as controlling persons, violated Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).

## A. Legal Standards

### 1. Rule 12(b)(6)

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissal of a complaint for failure to state a claim is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999); *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (stating that the task of the court is to assess the legal feasibility of the complaint, not weigh the evidence). Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (quoting *Palda v. General Dynamics Corp.*, 47 F.3d 872, 875 (7th Cir.1995)).

The Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences therefrom in the non-movant's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Harris*, 186 F.3d at 247. The Court must limit itself to facts stated in the complaint and documents attached to the complaint as exhibits or incorporated by reference. *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999).

It may also consider, "public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) (citations omitted).

### 2. Section 10(b) and Rule 10(b)5

To state a *prima facie* case under the Securities Exchange Act of 1934 § 10(b), and Rule 10b–5 promulgated thereunder, Plaintiffs must allege: (1) a misrepresentation or omission; (2) of a material fact; (3) made with scienter; (4) upon which plaintiff relied; and (5) which proximately caused plaintiff's injuries. *Wright v. Ernst & Young, LLP*, 152 F.3d 169, 177 (2d Cir.1998); *Acito v. IMCERA Group Inc.*, 47 F.3d 47, 52 (2d Cir.1995).

### 3. Pleading requirements for fraud: Fed.R.Civ.P. Rule 9(b) and the PSLRA

Rule 9(b) of the Federal Rules of Civil Procedure requires that allegations of fraud be stated with particularity. "Specifically, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills. v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).

Enacted in 1995 the Private Securities Litigation Reform Act (PSLRA) heightened the pleading requirements for establishing securities fraud. The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).[5]

---

**5.** Even before enactment of the PSLRA in 1995, plaintiffs in Section 10(b) cases had to

allege particular facts demonstrating that at

Since the Amended Complaint charges Defendants as a group with fraud, there are two principal issues before the Court. The first issue is whether group pleading is appropriate in this case. The second issue, which applies solely to the aspect of the claim concerning allegedly misleading statements about Cross Media's future earnings, is whether Defendants' allegedly fraudulent statements are protected by the safe harbor provision of the PSLRA.

## B. Analysis of the first 10(b) claim

The thrust of the first part of Plaintiffs' Section 10(b) claim is that Defendants' statements prior to the filing of the FTC Complaint in April 2002 were part of a conspiracy to inflate the price of Cross Media stock by failing to disclose that Cross Media's earnings were based on using the same illegal marketing practices which had been the subject of the December 1996 cease and desist order against Prochnow and DSI L.P. (Pls.' Mem. L. Opp'n Defs.' Mot. Dismiss Consol. Am. Compl. [hereinafter Pls.' Mem.] at 3–4.) The Amended Complaint reflects the allegations about marketing practices contained in the FTC action filed April 11, 2002, which listed fourteen causes of action. The first nine causes of action charged Prochnow, Gougion and MOS (under its own name and under previous business names, DSI L.P. and DSI) with violating the 1996 FTC order on numerous occasions since April 1997.[6] (FTC Compl.

¶¶ 38–47.) The tenth through fourteenth causes of action charge Prochnow, Gougion and MOS since "sometime in 1998" or April 1997, and Cross Media and Altbach since January 28, 2000, with violating two different provisions of the FTC's Telemarketing Sales Rule (16 C.F.R. §§ 310.3(a)(4), 310.3(a)(1)(ii)) and three provisions of Section 5(a) of the FTC Act (15 U.S.S. § 45(a)) subsequent to January 28, 2000. (FTC Compl. ¶¶ 56–64.)

### 1. Group pleading of acts

"The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." *Polar Int'l Brokerage Corp. v. Reeve*, 108 F.Supp.2d 225, 237 (S.D.N.Y.2000). The Court finds Plaintiffs' resort to the use of group pleading is inappropriate in this case. To begin with, the PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The statute's use of the singular "defendant" counsels against group pleading in actions arising in securities fraud cases since the enactment of the PSLRA.[7] Next, the individual Defendants in this case are too diverse in their alleged relationships to Cross Media to require them to defend this action on the basis of group pleading. Under the group pleading doc-

the time the statements were made, the Defendants knew or should have known that the statements were false. *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1248 (2d Cir.1987). In *Acito v. IMCERA Group, Inc.*, the Second Circuit reiterated that, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (citing *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)). The Second Circuit has found that the PSLRA had adopted the Second Circuit's "strong in-

ference" standard. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000).

6. Defendants Borgida and Cervantes are not defendants in the FTC cause of action.

7. This rationale was recently expressed by the Fifth Circuit in its recent case holding that the PSLRA abolishes the group pleading doctrine. *Southland Securities Corporation v. INSpire Insurance Solutions, Inc.*, 2004 WL 626721 (5th Cir. Mar.31, 2004).

trine, a plaintiff's complaint must allege: "(1) that the defendants are insiders or affiliates participating in the offer of the securities in question (the *Luce* exception); and, (2) ... particular facts demonstrating the knowledge of defendants at the time that the statements were false (the *DiVittorio* clarification)." *ESI Montgomery County, Inc. v. Montenay International Corp.* 1996 WL 22979 at *4 (S.D.N.Y. Jan.23, 1996); *see DiVittorio,* 822 F.2d at 1247; *Luce v. Edelstein,* 802 F.2d 49, 57 (2d Cir.1986).

Plaintiffs assert that because Defendants were "clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions," group pleading is appropriate. *Polar Int'l Brokerage Corp.,* 108 F.Supp.2d at 237. This reliance on *Polar* is misplaced. In *Polar,* the individual defendants were alleged to have participated individually in negotiating the offer and in drafting an allegedly fraudulent solicitation and tender offer statement. *Id.* at 238. Moreover, the solicitation in *Polar* included letters to shareholders from the five individual defendants. *Id.* No allegations containing specific acts by each of the individual Defendants, other than Altbach, are contained in the Amended Complaint, nor are there allegations that each of the Defendants participated in creating the statements attributed to Cross Media or to Altbach. And with the exception of Altbach, statements are not attributed to individual defendants. Additionally, the claim is not supported by any specific allegation of fact showing that each Defendant had knowledge that Cross Media's marketing practices in fact did violate the 1996 cease and desist order.

### 2. Group pleading of scienter in allegations of fraud

▇▇▇▇ In addition to failing to plead that each Defendant made misrepresentations, the Amended Complaint utilizes group pleading for the scienter allegations. (Am. Compl. ¶¶ 96–104; Pls.' Mem. at 23–24.) The Amended Complaint does not adequately plead that each Defendant acted with "the required state of mind"—an intent to defraud as required by the PSLRA. 15 U.S.C. § 78u–4(b)(2). To demonstrate this state of mind, Plaintiffs must (1) "allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," or (2) allege facts showing that defendants "had both motive and opportunity to commit fraud," *Press v. Chemical Investment Services Corp.,* 166 F.3d 529, 537–38 (2d Cir.1999) (internal quotations omitted).

Plaintiffs do not adequately plead strong circumstantial evidence of conscious misbehavior or recklessness during the class period as required by *Press. See Press,* 166 F.3d at 537–38. Generally, Plaintiffs attribute recklessness to the Defendants as a group without citing to specific reckless actions or inactions of particular Defendants. (*See* Am. Compl. ¶¶ 96, 104.) Altbach, however, is mentioned by name in Paragraph 104. (Am. Compl. at ¶ 104.) The pleadings with respect to Altbach are insufficient to establish scienter, because there are no specific allegations that he failed to check information that he had a duty to monitor, ignored obvious signs, or made public statements inconsistent with reasonably available data. *See Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000). For example, Plaintiffs make the following conclusory allegations without pleading particular facts to support them. "Altbach mislead investors to believe that the pending regulatory action was having a minimal impact in Cross Media's operations when, in truth and in fact, the action had forced Cross Media into greater compliance with applicable consumer laws, and was therefore having a major material negative effect upon its business operations." (Am. Compl. ¶ 104(f).) Plaintiffs do not support

their allegations with allegations of particular facts showing that Cross Media had been forced into greater compliance. Plaintiffs also allege that Altbach "knew, or recklessly disregarded, that the Company [Cross Media] was persisting in classic unlawful schemes." (*Id.* at ¶ 104(c).) Plaintiffs do not allege that Altbach received specific reports that contained clear signs of unlawful business practices of which he should have known. *See In re Providian Financial Corporation Sec. Litig.*, 152 F.Supp.2d 814, 825 (E.D.Pa.2001) (finding scienter adequately pled when complaint alleged individual defendants had received periodic sales reports indicating that improper accounting practices were inflating the company's revenues).

■ Furthermore, Plaintiffs fail to adequately plead motive, a pleading requirement for scienter under *Press*. *See Press*, 166 F.3d at 537–38. The Amended Complaint alleges that Defendants had six motives to commit securities fraud:

to: (a) enable Defendants to continue acquiring companies by using Cross Media's inflated stock as currency for the acquisitions, (b) maintain compliance with various financial covenants from their lenders; (c) sell inflated stock in a private placement; (d) protect and enhance the Individual Defendants' executive positions and the substantial compensation and prestige they obtained thereby; (e) enhance the value of the Individual Defendants' substantial personal holdings of Cross Media; and (f) prevent the public from learning of their improper acts concerning the operations of Cross Media and MOS for their own personal benefit.

(Am. Compl. ¶ 102; *see also* ¶ 9.)

Plaintiffs' first motive allegation—that Defendants desired to use inflated stock as currency for Cross Media's acquisitions—is inadequate. (Am.Compl.¶ 102(a)(c).) In *Rombach v. Chang*, 355 F.3d 164 (2d Cir.

2004), the plaintiffs alleged that the defendant's motives were to complete a previously arranged corporate acquisition and to retire debt and minimize the number of shares used by the companies in these transactions. The Second Circuit found that these allegations were insufficient to plead motive because plaintiffs did not allege facts showing that the individual defendants were motivated by any personal expectation of increased compensation, insider trading or fees from analysts or underwriters. *Rombach*, 355 F.3d at 177; *see also Thacker v. Madaphis Corp.*, No. 97 Civ. 2849, 1998 WL 684595, at *3 (S.D.N.Y. Sept. 30, 1998) (holding that motives that any for-profit, public endeavor would have, including the "aggressive acquisition of related companies," are not sufficient to impute fraud); *In re Health Management Systems, Inc. Sec. Litig.*, No. 97 Civ. 1865, 1998 WL 283286, at 6 n. 4 (S.D.N.Y. June 1, 1998) ("Desire to consummate corporate transaction does not constitute a motive to commit securities fraud."); *Leventhal v. Tow*, 48 F.Supp.2d 104, 115 (D.Conn.1999) (alleging that defendants had "motive to artificially inflate... stock price... in order to get more favorable terms in the stock-for-stock transactions" is insufficient pleading of scienter).

Here, the Amended Complaint contains the allegations of a motive to profit from two corporate acquisitions. On January 11, 2002, Cross Media purchased all of the capital stock of National Syndication, Inc. ("NSI") and all of the capital stock of Preferred Customer Marketing, Inc. ("PCM") for $16.9 million, of which only $2.47 million was Cross Media common stock. (Am.Compl.¶ 103(a).) On May 27, 2002, after the FTC action and consequent drop in the price of Cross Media stock, Cross Media acquired JWE Enterprises, Inc. and JWE Holdings, Inc. for $13.5 million, including $5.0 million of Cross Me-

dia common stock and nearly $2 million of preferred stock. (*Id.* at 103(c).) In neither of these acquisitions was the issuance of the stock the principal consideration for the acquisition, which makes Plaintiffs' allegation that Defendants sought to benefit by using inflated stock for these acquisitions ring hollow. Furthermore, it is not alleged that any individual Defendant expected to receive, or did receive, any personal "concrete benefit" as a result of the acquisition or the issuance of the stock in either instance.

Also, the alleged desires to raise additional capital in a private placement or to maintain compliance with the financial covenants of a company loan agreement (Am. Compl.¶¶ 102(b), 102(c)) are similarly inadequate to support an allegation of intent to commit fraud. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801, 813–814 (2d Cir.1996) (holding allegation that defendants acted to "maximize the marketability of the $700 million of debt securities... and minimize the interest rate on those securities" insufficient to show motive); *see Wilson v. Bernstock*, 195 F.Supp.2d 619, 637 (D.N.J.2002) (desiring to maintain compliance with debt covenants insufficient motive to allege scienter without pleading facts indicating a "desperate" or "urgent" need to avoid default).

Under Second Circuit precedent, allegations of a desire to "protect and enhance ... executive positions and the substantial compensation and prestige ... obtained thereby" or the desire to "prevent the public from learning of ... improper acts" have been held insufficient to show fraudulent motive. (Am.Compl.¶¶ 102(d), 102(f).) *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 ("[P]laintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold."); *Kushner v. Beverly Enterprises*, 317 F.3d 820, 830 (8th Cir.2003) ("Pleading the simple fact a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate value or earnings.") (quotations omitted); *Kalnit v. Eichler*, 99 F.Supp.2d 327, 337–39 (S.D.N.Y.2000) (finding insufficient pleading of scienter when plaintiff alleged the avoidance of personal liability as a motive particularly because the personal liability of the defendants was dependant upon the liability of the corporation).

Finally, seeking to "enhance the value of individual Defendants' substantial personal holdings of Cross Media," (Am. Compl.¶ 102(e)) is a motive which could be imputed to any officer of a publicly held corporation, and thus an inadequate allegation of motive. *See Kalnit*, 99 F.Supp.2d at 335 ("Fraudulent motive is generally demonstrated through allegations of insider trading or some other type of pecuniary gain by company insiders at the expense of shareholders."); *San Leandro Emergency Medical Group Profit Sharing Plan* 75 F.3d at 814.

### 3. Group pleading fails as to each Defendant

In conclusion, the group pleading in the Amended Complaint fails with respect to each of the individual Defendants. As to Defendants Cervantes and Borgida, the FTC Complaint and the Amended Complaint contain no allegations of participation in or knowledge of the marketing practice violations by either of them. As to Defendant Prochnow, whom the Amended Complaint characterizes as a "putative 'consultant'" (Am. Compl. at ¶ 8), the FTC has since agreed that it would only proceed against him for acts prior to January 28, 2000 (the date Symposium acquired the assets of Prochnow's company, DSI L.P.). Thus, the Amended Complaint's reliance on the review of Plaintiffs' counsel of the

FTC Complaint as evidence of actions in the class period is not appropriate as to Prochnow. As to Defendant Gougion, the Amended Complaint does not allege Defendant Gougion owns stock in Cross Media, thus a clear motive in inflating the price of Cross Media's stock is not established as to him in the Amended Complaint.[8] As to Defendant Altbach, he is not alleged to have prior experience with the Telemarketing Rule or the FTC cease and desist order, prior to Symposium's acquisition of the assets of DSI in January 2000. At that time, DSI was a company which to all intents and purposes, had abided by the FTC cease and desist order for the past three years without incident. Accordingly, Altbach's alleged knowledge that Cross Media's telemarketing practices were the same practices found illegal by the FTC in 1996 is not supported by the factual allegations of the Amended Complaint.

### C. Plaintiff's Second Section 10(b) claim

#### 1. Safe harbor protections

■ The second claim in the Amended Complaint's Section 10(b) cause of action is that Defendants' statements misled investors with respect to Cross Media's earnings for the year 2002, specifically, its second quarter earnings. Under the "bespeaks caution" doctrine, "[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker Usa.com, Inc.*, 295 F.3d 352, 357 (2d Cir.

**8.** Defendant Cervantes also is not alleged to own stock in Cross Media.

**9.** The Amended Complaint does not allege that Cross Media reported false earnings for the year 2001, or for the first quarter of 2002,

2002).[9] Excerpts from the press releases and from filings with the SEC attributed to Cross Media and Mr. Altbach quoted in the Amended Complaint are, in every instance, forward-looking, optimistic statements containing cautionary language and are protected by the "bespeaks caution" doctrine.

When there is cautionary language in the disclosure, the Court analyzes:

> the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.

*Id.*

Additionally, Plaintiffs' claims of false and misleading projections run afoul of the safe harbor provisions of the PSLRA, which makes forward-looking statements not actionable:

> if and to the extent that (A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (B) the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge by that per-

or that those earnings were required to be restated. Instead, these statements are claimed to have misled investors by their projections of earnings for the second quarter of 2002 and earnings for the year 2002. (Am. Compl.¶¶ 19, 60–70.)

son that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1).

Pursuant to the "bespeaks caution" doctrine and the safe harbor provision, the allegedly fraudulent forward-looking statements must be examined in the light of the cautionary language surrounding them. Cross Media's annual report dated March 27, 2002, filed with the SEC for the fiscal year ending December 31, 2001 with Form 10–KSB (Freeman–Bosworth Decl. Ex. E; Am. Compl. ¶¶ 69–70) and Cross Media's Form 10–Q for the quarter ending March 31, 2002 (Freeman–Bosworth Decl. Ex. I; Am. Compl ¶¶ 84–85) contained forward looking statements. Additionally, the reports listed the numerous specific factors that could materially affect those forward-looking statements, including the oversight of its telemarketing business by government regulatory bodies. This warning was contained in raised lettering as follows:

GOVERNMENT REGULATION COULD ADD SIGNIFICANT ADDITIONAL COSTS TO CROSS MEDIA'S BUSINESS AND IMPOSE RESTRICTIONS ON CROSS MEDIA'S MARKETING PRACTICES WHICH COULD INTERFERE WITH CROSS MEDIA'S OPERATIONS AND HAVE A SIGNIFICANT ADVERSE EFFECT ON REVENUES.

(Freeman–Bosworth Decl. Exs. E at 23, I at 11.)

Cross Media's Form 10–Q filed May 12, 2002, also pointed out that the FTC Complaint had been filed and that "it may have to modify MOS marketing practices which could have a material adverse effect on Cross Media" (Freeman–Bosworth Decl., Ex. I at 10–11).

Cross Media's press releases during the class period contained the following safe harbor warnings about forward-looking statements:

Such forward-looking statements are based on current expectation of management but involve certain risks and uncertainties. Cross Media's actual results, performance or achievements could differ materially from the results, performance or achievements projected in, or implied by such forward-looking statements as a result of risk factors, including, without limitation, the following ... risks relating to government regulation of telemarketing and Internet marketing activities ... These factors are described in detail in Cross Media's filings with the Securities and Exchange Commission, including, where applicable, its most recent filings on Forms 10–KSB and 8–K.

(*Id.,* Exs. D, N; *See also* Exs. F, G, H, J, L.)

Cross Media's estimates are based on preliminary financial information which has not been audited by Cross Media's independent public accountants, and is therefore may be [*sic.*] subject to adjustment. Cross Media's projections are based on numerous assumptions about its business, general economic conditions, competitive factors, industry performance and other factors which cannot be predicted with certainty. Therefore, Cross Media's results are likely to vary from the projections, and the variations could be material. Accordingly, neither the estimates nor projections should be regarded as a representation or a prediction that Cross Media or any of the other companies presented will achieve any particular results.

(*Id.* Exs. F, G.)

Similar safe harbor statements are contained in press releases dated November 5, 2001 (*id.,* Ex. D); July 12, 2002 (*id.,* Ex. P); and April 10, 2002 (*id.,* Ex. J). The April 10, 2002 press release dealing with the filing of the FTC action that same day

contained the following cautionary statement:

Cross Media's actual results, performance or achievements could differ materially from the results, performance or achievements projected in, or implied by, [the] forward-looking statements as a result of risk factors, including, without limitation ... risks relating to government regulation of telemarketing....

(*Id.*, Ex. J.)

The May 9, 2002 (*Id.*, Ex. L.) and May 29, 2002 (*id.*, Ex. N) press releases identified as one of the risk factors "the outcome of the recent FTC civil action." And, Cross Media's form 10–Q filed with the SEC on May 15, 2002 advised that because the FTC action was in its early stages:

Cross Media is unable to predict the outcome. In the event that Cross Media is unable to resolve this matter amicably, it could be subject to monetary damages and injunctive relief which could have a material adverse effect on Cross Media. Even if Cross Media is able to resolve this matter amicably, it may have to agree to modify MOS' operating practices which could have a material adverse effect on Cross Media.

(*Id.* Ex. I at 11.)

In the light of all of these cautions, a reasonable investor with knowledge of the FTC action would have examined Cross Media's 10–K and 10–Q reports filed with the SEC. The reasonable investor would not have been misled by Mr. Altbach's representations of expected earnings or omissions concerning MOS' past FTC violation, if he had considered the context of the statements as well as the total mix of information available to him. *Halperin,* 295 F.3d at 357.

Lastly, both the oral telephone interview with the FTC analysts on April 10, 2002 (Freeman–Bosworth Decl., Ex. K) and the interview of Altbach by the OTC Journal

on June 17, 2002 (*id.,* Ex. O) were prefaced by reference to the safe harbor for forward-looking statements.

**2. Scienter**

In addition to being protected by the safe harbor provision, forward looking statements are also protected if, "the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B). In a phone conference on April 10, 2002, Mr. Altbach responded to a question as to whether the FTC could require Cross Media to shut down its operations after the hearing by answering, "I don't think so and we don't think so. But, I'd rather not discuss that now because we don't have any idea what the outcome of this will be." (Freeman–Bosworth Decl., Ex. K at 3.) No actual knowledge that either of these statements was false is alleged in the Amended Complaint. *See In re Nokia Sec. Litig.,* No. 96 Civ. 3752, 1998 WL 150963, at * 13 (S.D.N.Y. Apr.1, 1998) (failing to find recklessness adequately pled when facts alleged that defendant failed to disclose "marginally related material information"). "Conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b)." *Shields,* 25 F.3d at 1129. At no place does the Amended Complaint plead facts supporting the allegation that a statement made by Altbach in the teleconference of April 10, 2002, or in the telephone interview on June 17, 2002 was made with actual knowledge that it was false. *See* 15 U.S.C. § 78u–5(c)(1)(B). Instead, the Amended Complaint alleges that because optimistic statements about quarterly earnings were made two months after the FTC Complaint was filed, "Defendants were well-aware of (or recklessly disre-

garding) any material adverse impact of the FTC action by this time." (Am. Compl. ¶ 91; *see also id.* ¶¶ 104(d); 96.) The Amended Complaint does not allege that Defendants had received a report showing a material adverse impact on sales prior to June 17, 2002. Similarly, Altbach's June 17, 2002 interview statement that Cross Media "was absolutely on track" (Freeman–Bosworth Decl., Ex. O,) was made two weeks before the close of the quarter, but there is no allegation that contrary information had been furnished him when he made the statement.

#### D. Section 20(a)

In order to make a Section 20(a) claim, Plaintiffs "must show (1) a primary, securities law violation by the controlled person and (2) control over the primary violator by the targeted defendant." *Burstyn v. Worldwide Xceed Group, Inc.,* No. 01 Civ. 1125, 2002 WL 31191741, at * 7 (S.D.N.Y. Sept. 30, 2002). Because Plaintiffs have failed to properly allege a violation of Section 10(b) and Rule 10(b)(6), they have also failed to make a Section 20(a) claim.

#### E. Rule 11 Sanctions

The PSLRA requires the Court to determine "upon final adjudication," whether Fed.R.Civ.P. 11 sanctions should be imposed on any party or attorney in connection with the filing of a private securities action. 15 U.S.C. § 78u–4(c)(1). Because this case is dismissed without prejudice and with leave to re-file, the Court may not have made a "final adjudication" and it may be unnecessary for the Court to rule on the applicability of Rule 11 sanctions at this time. *High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420, 430 n. 7 (S.D.N.Y.1998); *See DeMarco v. Depotech Corp.,* 131 F.Supp.2d 1185, 1187 (S.D.Cal.2001) (concluding that "final adjudication" refers to *inter alia* cases dismissed with prejudice without leave to amend).

Nevertheless, the Court has considered, as is required by the PSLRA, whether Fed.R.Civ.P. 11 sanctions should be imposed on any party or attorney in connection with the filing of the Amended Complaint, or motions brought in this litigation. Since this opinion holds that group pleading is not permitted under the PSLRA and there was no circuit court authority to that effect prior to oral argument, the Court determines that sanctions are not appropriate. *See Pierce v. F.R. Tripler & Co.,* 955 F.2d 820, 830–31 (2d Cir.1992) (reversing sanction award because in the absence of controlling authority to the contrary, party had good faith basis to press a legal argument supported by a single decision of state court). Accordingly, the Court does not find that Rule 11 was violated by any party or attorney.

#### III. Conclusion

The Amended Complaint is dismissed with leave to Plaintiffs to file a Second Amended Complaint within thirty days of the filing of this opinion and order if they so choose.

IT IS SO ORDERED.